Filed 11/4/21  The Basketry v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE BASKETRY, INC.,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>     Respondent;<br><br>ANITA OGLETREE,<br><br>     Real Party in Interest. | A162746<br><br>(Alameda County<br>Super. Ct. No. RG19042771) |

**BY THE COURT:**[*]

The issue in this writ proceeding is not whether The Basketry, a small, woman-owned Louisiana business specializing in New Orleans themed gift baskets, must ensure that its Web site complies with the American With Disabilities Act (ADA).  Rather, it is whether this Louisiana boutique can be sued in California on a claim that it has violated that federal law and, thereby, California's Unruh Civil Rights Act (Unruh Act).[1]

_____

[*] Before:  Humes, P.J., Margulies, J., and Banke, J.

[1] Subdivision (f) of the Unruh Act provides:  "A violation of the right of any individual under the federal Americans with Disabilities Act of 1990

1

It is undisputed that The Basketry does not have sufficient contacts with California to support general personal jurisdiction. However, plaintiff and real-party-in-interest, Anita Ogletree, who is visually impaired, maintains California can exercise specific personal jurisdiction over the small business because it maintains an interactive Web site that, at the time Ogletree accessed the site, allowed online purchases by anyone with access to the world wide web, including in California. (The Web site now precludes sales to California purchasers.) The trial court ruled that binding precedent, principally *Thurston v. Fairfield Collectibles of Georgia, LLC* (2020) 53 Cal.App.5th 1231 (*Thurston*), compelled the conclusion that The Basketry's online presence and the small number of internet purchases by persons accessing the web in California was sufficient to establish that the Louisiana boutique is properly answerable in California to Ogletree's claim that its Web site violated the ADA.

We conclude the instant case differs in material degree from *Thurston*. And what we discern from pertinent authorities, is that specific personal jurisdiction based on interactive Web site activity is a factually intensive issue and the continuum along which these cases fall is highly nuanced. Given the particular facts of this case, we further conclude it cannot fairly be said that this small Louisiana business has sufficiently focused on or targeted California to make this state a proper jurisdiction for a lawsuit against it based on the ADA and the Unruh Act.

We therefore grant The Basketry's unopposed petition for a writ of mandate requiring the trial court to vacate its order denying its motion to quash and to enter a new order granting the motion.

---

(Public Law 101-336) shall also constitute a violation of this section." (Civ. Code, § 51, subd. (f).)

# BACKGROUND

Ogletree filed an unverified complaint against The Basketry in November 2019, alleging its interactive Web site was not fully accessible to the visually impaired in violation of the ADA and, derivatively, the Unruh Act. She alleges that she "is permanently blind and uses screen readers in order to access the internet and read website content." She maintains she "genuinely wants to avail herself of [The Basketry's] goods and services as offered on [the company's] Website," but makes no claim she attempted, but was unable, to make any purchase on the site. Rather, she alleges she has been unable to "independently and privately investigate [The Basketry's] products, services, privileges, advantages, accommodations, and amenities, as sighted individuals can and do." She alleges she has "attempted[ed] to utilize the Website and plans to continue to attempt to utilize such Website in the near future."

Ogletree acknowledges she "has a dual motivation" in filing suit. She is also a " 'tester,' " which one federal court has defined as an individual with a disability who visits "places of public accommodation to determine their compliance with Title III [of the ADA].' "[2]

Ogletree sought injunctive relief and damages, but "expressly limit[ed] the total amount of recovery, including statutory damages, attorneys' fees and costs, and cost of injunctive relief not to exceed $74,999." She thereby prevented removal of the case to federal court. (28 U.S.C. § 1332, subd. (a).)

The Basketry filed a motion to quash service of summons, supported by the declaration of Kristi Brocato, The Basketry's sole shareholder. She and her husband operate the small business which specializes in selling

_____

[2] In the two years prior to The Basketry's motion to quash, Ogletree and her counsel filed approximately 60 similar actions in California courts.

3

personalized, New Orleans-themed gift baskets. It has one retail shop, in Luling, Louisiana. It has never had any physical presence in California or employed any California resident.

After receiving a demand letter from Ogletree and her attorney stating The Basketry's Web site was not in compliance with the ADA, Brocato immediately took steps to remediate any accessibility issues. These included, but were not limited to, adding captioning to videos on the page, making colors more contrasting, and adding descriptive alt text behind each picture on the Web site. This process took approximately two months and cost $6,500 to complete. In the meantime, however, Ogletree proceeded to file the instant lawsuit, alleging that The Basketry's Web site lacked these features.

The vast majority of The Basketry's sales come from Louisiana residents through phone orders and in-person purchases at its shop. It also has an interactive Web site that allows users to make purchases, which can be shipped throughout the country. According to Brocato, "[t]he website is primarily an online catalog for phone shoppers. Due to the nature of our custom designed gift business model, we encourage people to call the orders in because most customers want custom creations."

The Basketry has never engaged in advertising specifically directed at California or its residents. It does, however, purchase "retargeting ads" through Facebook that "will result in Basketry advertising being displayed in Facebook or Instagram if a user [has] been to [the company's] website or used organic key words related to [its] website." While it targets browsers based on income, age, and associated interests, it has no control over the geographic areas in which users may see these ads.

In 2019, The Basketry's total sales were $1,864,883. Of this amount, $128,872 was from internet sales, $7,725.23 of which was from internet sales

4

originating in California.[3]  Thus, sales to California users amounted to approximately 0.41 percent of its total sales and approximately six percent of its internet sales.  Approximately 75 percent of its sales, both in-store and online, were to Louisiana residents.

In 2018, The Basketry's total sales were $1,800,198.  Of this amount, $103,130 was from internet sales, $4,038.72 of which was from online sales originating in California.[4]  In 2017, The Basketry's total sales $1,800,000.  Of this amount, $83,362 was from internet sales, $174 of which was from online sales originating in California.

After the lawsuit was filed, The Basketry stopped accepting orders from California residents.

The Basketry moved to quash service of process.  It asserted that (1) it did not have sufficient minimum contacts to support personal jurisdiction in California; (2) its contacts with the state were unrelated to the subject matter of the underlying action; and (3) the court's assertion of jurisdiction over it would be unreasonable.  Ogletree filed opposition, and following a hearing, the trial court denied the motion in a written order.

After The Basketry filed the instant petition, we issued a stay and *Palma*[5] notice.  We also twice invited Ogletree to file opposition, which she did not do.[6]  Accordingly, the allegations in the petition are unopposed.

---

[3]  The California amount was generated by 79 transactions.

[4]  The California amount was generated by 38 transactions.

[5]  *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177–180.

[6]  " 'Having complied with the procedural prerequisites, we are authorized to issue a peremptory writ in the first instance.' " (*Johnny W. v. Superior Court* (2017) 9 Cal.App.5th 559, 568.)

5

## DISCUSSION

If a nonresident defendant believes it is not subject to the jurisdiction of a California court, it may file a motion to quash service of summons for lack of jurisdiction. (Code Civ. Proc., § 418.10, subd. (a)(1).) California courts "may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." (*Id.*, § 410.10.) "Because state law in this field stretches to the limits set by federal law, state law here incorporates federal law. California state courts cannot extend the reach of their personal jurisdiction beyond federal limits." (*Buskirk v. Buskirk* (2020) 53 Cal.App.5th 523, 531.)

" 'When a defendant moves to quash service of process on jurisdictional grounds, the plaintiff has the initial burden of demonstrating facts justifying the exercise of jurisdiction. [Citation.] Once facts showing minimum contacts with the forum state are established, however, it becomes the defendant's burden to demonstrate that the exercise of jurisdiction would be unreasonable.' " (*Burdick v. Superior Court* (2015) 233 Cal.App.4th 8, 17 (*Burdick*), quoting *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449.[7]) "The plaintiff must come forward with affidavits and other competent evidence to carry this [initial] burden and cannot simply rely on allegations in an unverified complaint."[8] (*ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 210.) "The plaintiff must ' "present facts demonstrating that the conduct of defendants related to the pleaded causes is such as to

---

[7] Abrogated on other grounds in *Bristol-Myers Squibb v. Superior Court* (2017) __ U.S. __, [137 S.Ct. 1773, 1781], 198 L.Ed.2d 395 (*Bristol-Myers*).

[8] Since Ogletree's complaint is unverified, it " 'has no evidentiary value in meeting [her] burden of proving minimum contacts.' " (*Archdiocese of Milwaukee v. Superior Court* (2003) 112 Cal.App.4th 423, 434 (*Archdiocese*).)

constitute constitutionally cognizable 'minimum contacts.' " ' " (*Archdiocese, supra,* 112 Cal.App.4th at p. 434.) Only if the plaintiff meets this initial factual burden, does the burden then shift to the defendant to show that the exercise of jurisdiction would be unreasonable. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1062 (*Snowney*), abrogated on another ground in *Bristol-Myers, supra,* 137 S.Ct. at p. 1781].)

If the trial court denies a defendant's motion to quash, the defendant "may petition an appropriate reviewing court for a writ of mandate to require the trial court to enter its order quashing the service of summons or staying or dismissing the action." (Code Civ. Proc., § 418.10, subd. (c).) "When the evidence of jurisdictional facts is not in dispute," as is the case here, "the issue whether the defendant is subject to personal jurisdiction is a legal question subject to de novo review." (*Burdick, supra,* 233 Cal.App.4th at p. 17.)

### *Personal Jurisdiction Fundamentals*

The United States Supreme Court has "recognized two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction. . . . A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." (*Bristol-Myers, supra,* 137 S.Ct. at pp. 1779–1780.)

"Specific jurisdiction is very different. In order for a state court to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.' [Citations.] In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.' [Citation.] For this reason,

7

'specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.' " (*Bristol-Myers, supra,* 137 S.Ct. at p. 1780.)

As the United States Supreme Court has very recently explained:

"Specific jurisdiction . . . covers defendants less intimately connected with a State, but only as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.' [Citation.] The defendant, we have said, must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.' [Citation.] The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.' [Citation.] They must show that the defendant deliberately 'reached out beyond' its home— by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there. [Citation.] Yet even then—because the defendant is not 'at home'—the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims, we have often stated, 'must arise out of or relate to the defendant's contacts' with the forum. [Citations.] Or put just a bit differently, 'there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." ' " (*Ford Motor Co. v. Montana Eighth Judicial District Court* (2021) __ U.S. __, 141 S.Ct. 1017, 1024–1025 (*Ford Motor Co.*).)

The California Supreme Court has, thus, put it, "[a] court may exercise specific jurisdiction over a nonresident defendant only if: (1) 'the defendant has purposefully availed himself or herself of forum benefits' [citation]; (2) 'the "controversy is related to or 'arises out of' [the] defendant's contacts with the forum" ' [citations]; and (3) ' "the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " ' " (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 269 (*Pavlovich*), abrogated on another ground as stated in *David L. v. Sup. Ct.* (2018) 29 Cal.App.5th 359, 369–370, 372.)

8

***Specific Jurisdiction***

     ***Purposeful Availment***

     The first element of specific jurisdiction is whether the defendant "purposefully availed" itself of forum benefits. (*Snowney, supra,* 35 Cal.4th at p. 1062.) The Basketry contends it "has not purposefully availed itself of the forum benefits to such an extent that it would be foreseeable that the Basketry could be haled into court in the state of California."

     " 'The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs [its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receives, to be subject to the court's jurisdiction based on' [its] contacts with the forum. (*U.S. v. Swiss American Bank, Ltd.* (1st Cir. 2001) 274 F.3d 610, 623 (*Swiss American Bank*).) Thus, the ' "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts [citations], or of the "unilateral activity of another party or a third person." ' " (*Pavlovich, supra,* 29 Cal.4th at p. 269, quoting *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 475 (*Burger King*).)

     "[P]urposeful availment occurs where a nonresident defendant ' "purposefully direct[s]" [its] activities at residents of the forum' (*Burger King, supra,* 471 U.S. at p. 472), ' "purposefully derive[s] benefit" from' its activities in the forum (*id.* at p. 473), 'create[s] a "substantial connection" with the forum' (*id.* at p. 475), ' "deliberately" has engaged in significant activities within' the forum (*id.* at pp. 475–476), or 'has created "continuing obligations" between [itself] and residents of the forum' (*id.* at p. 476). By limiting the scope of a forum's jurisdiction in this manner, . . . the defendant

9

will only be subject to personal jurisdiction if ' "it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the state." ' " (*Snowney, supra,* 35 Cal.5th at p. 1063, quoting *Pavlovich, supra,* 29 Cal.4th at p. 269, quoting *World–Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 (*World-Wide Volkswagen*).)

To determine whether Web site activity constitutes purposeful availment, our Supreme Court has endorsed a sliding scale approach.[9] (*Snowney, supra,* 35 Cal.4th at p. 1063.) " 'At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. [Citation.] At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. [Citation.] The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web

---

[9] This sliding scale approach applies specifically to Web sites, and it is unrelated to the " 'sliding scale approach' " to specific jurisdiction the California Supreme Court employed in *Bristol-Myers* and which the United States Supreme Court subsequently rejected. (*Bristol-Myers, supra,* 137 S.Ct. at p. 1781.)

10

site.' " (*Ibid.,* quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* (W.D.Pa. 1997) 952 F.Supp. 1119, 1124.)

The court also observed that " '[s]ome courts have held that sufficient minimum contacts are established, and the defendant is "doing business" over the Internet, where the defendant's website is capable of accepting and does accept purchase orders from residents of the forum state.' (*Shamsuddin v. Vitamin Research Products* (D.Md. 2004) 346 F.Supp.2d 804, 810.) Other courts have suggested that ' "something more" ' is necessary, such as ' "deliberate action" within the forum state in the form of transactions between the defendant and residents of the forum or conduct of the defendant purposefully directed at residents of the forum state.' (*Millennium* [*Enterprises, Inc. v. Millennium Music, LP* (1999)] 33 F.Supp.2d [907,] 921; see also *Toys "R" Us, Inc. v. Step Two, S.A.* (3d Cir. 2003) 318 F.3d 446, 454 ['there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts'].) Other courts 'have criticized *Zippo's* emphasis on website interactivity' (*Shamsuddin,* at p. 810) and focus instead on 'traditional due process principles' (*id.* at p. 811), asking whether the site expressly targets 'residents of the forum state' (*Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.* (W.D.Wis. 2004) 297 F.Supp.2d 1154, 1160). According to these courts, 'Website interactivity is important only insofar as it reflects commercial activity, and then only insofar as that commercial activity demonstrates purposeful targeting of residents of the forum state or purposeful availment of the benefits or privileges of the forum state.' (*Shamsuddin,* at p. 813; see also *Neogen Corp. v. Neo Gen Screening, Inc.* (6th Cir. 2002) 282 F.3d 883, 890 ['A defendant purposefully avails itself of the

privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state.'].)" (*Snowney, supra,* 35 Cal.4th at p. 1064; see also *Fidrych v. Marriott International, Inc.* (4th Cir. 2020) 952 F.3d 124, 141 [although defendant used its Web site to engage in commercial transactions, it "[did] not target South Carolina residents for commercial transactions any more than it target[ed] any other state"]; *Allied Ins. Co. of America v. JPaulJones L.P.* (E.D. Mo. 2020) 491 F.Supp.3d 472, 477-478 ["[c]ourt joins with many others in holding that specific jurisdiction does not attach simply because a defendant operates a commercial website that is, at some level, interactive and allow[s] for sales into the forum state"; there must be evidence the Web site operator specifically targets the forum state over any other state]; *Britax Child Safety, Inc. v. Nuna International B.V.* (E.D. Pa. 2018) 321 F.Supp.3d 546, 556 (*Britax*) ["A 'website may form the basis for specific jurisdiction if [the] defendant takes action to maximize usage of [the] website in the forum, markets [the] website in the forum, puts forum-specific content in [the] website[,] or has [a] business plan that targets users within [a] forum.' " Quoting *Hy Cite Corp. v. Badbusinessbureau.com LLC*, *supra*, 297 F.Supp.2d at p. 1164.].)

The court did not, however, endorse any one of these approaches, although it expressed considerable skepticism with respect to the plaintiffs' assertion that any interactive Web site allowing online purchases, by definition, falls within the first *Zippo* category and thus categorically suffices for specific personal jurisdiction.[10] (*Snowney, supra,* 35 Cal.4th at p. 1063, fn. 2.)

---

[10] This skepticism is consistent with the high court's decision in *Pavlovich* in which it concluded that the "effects test requires intentional

12

Rather, the court concluded that "by any standard," the Harrah's Web site at issue exemplified purposeful availment. (*Snowney, supra,* 35 Cal.4th at p. 1064 & fn. 2.) "By touting the proximity of their hotels to California and providing driving directions from California to their hotels, defendants' Web site specifically targeted residents of California. (See *Burger King, supra,* 471 U.S. at p. 472.) Defendants also concede that many of their patrons come from California and that some of these patrons undoubtedly made reservations using their Web site. As such, defendants have purposefully derived a benefit from their Internet activities in California (*id.* at p. 473), and have established a substantial connection with California through their Web site (*id.* at p. 475). In doing so, defendants have 'purposefully availed [themselves] of the privilege of conducting business in' California 'via the Internet.' (*Enterprise Rent–A–Car Company v. U–Haul Internat.* (E.D.Mo. 2004) 327 F.Supp.2d 1032, 1042–1043 [holding that a Web site that specifically targeted the forum state and its residents established purposeful availment].)" (*Snowney,* at pp. 1064–1065.)

The defendant businesses also "advertised extensively in California through billboards, newspapers, and radio and television stations located in California. They also listed a toll-free phone number for making reservations at their hotels in their California advertisements and on their Web site, and many of their California patrons used this number to make reservations. Finally, defendants regularly sent mailings advertising their hotels to

conduct *expressly aimed at or targeting* the forum state in addition to the defendant's knowledge that his intentional conduct would cause harm in the forum." (*Pavlovich, supra,* 29 Cal.4th at p. 271.) Applying that standard, the court held that a nonresident defendant did not expressly aim his allegedly tortious conduct at or intentionally target California merely by posting a California plaintiff's allegedly proprietary information on a publicly-accessible internet Web site. (*Id.* at pp. 273-279.)

selected California residents. As a result of these promotional activities, defendants obtained a significant percentage of their patrons from California. Thus, defendants purposefully and successfully solicited business from California residents." (*Snowney, supra,* 35 Cal.4th at p. 1064.)

As we have observed, the trial court here relied principally on *Thurston, supra,* 53 Cal.App.5th 1231 in denying The Basketry's motion to quash. In *Thurston,* the plaintiff made the same ADA/Unruh Act claim Ogletree makes here, against "the largest retail seller of diecast models via catalogs and the Internet in America." (*Id.* at pp. 1233–1234.) Employing the sliding scale analysis endorsed in *Snowney,* the panel majority concluded the purposeful availment requirement was satisfied given the volume of internet transactions with California residents. "To summarize, . . . under California case law, making a substantial number of sales of goods or services to California residents, via one's own website constitutes purposeful availment," and "[t]he vast majority of federal cases are in accord." (*Id.* at p. 1240.)

The diecast model retailer made internet sales to Californians totaling $320,000 to $375,000 annually, amounting to eight percent of its online sales. (*Snowney, supra,* 35 Cal.4th at p. 1240.) "That," said the court, was "the equivalent of having a brick-and-mortar store in California"—a " 'virtual store.' " (*Ibid.*) Accordingly, the retailer was "on notice that it could be sued in California." (*Ibid.*) Furthermore, even if additional evidence that the retailer deliberately " 'targeted' " Californians was required, that was

14

supplied by the substantial number of catalogs it mailed to California residents.[11] (*Id.* at p. 1241.)

The Basketry's connection with California is of a vastly lesser scale than that of the diecast model retailer in *Thurston*. The model retailer was the "the largest retail seller of diecast models via catalogs and the Internet in America," and had California internet sales of "about $320,000 to $375,000 a year," amounting to about eight percent of its total sales and about 10 percent of its direct-to-consumer sales. (*Thurston, supra,* 53 Cal.App.5th at p. 1235.) The Basketry, in contrast, is a small boutique business, owned solely by Brocato and operated by only Brocato and her husband. Its total internet sales figure for the year in question was dramatically smaller than that of the retailer in *Thurston*, and the amount of its California internet sales in that year, $7,725, was a bare fraction of the California internet sales in *Thurston*. This is not, in our view, the "substantial number of sales of goods or services to California residents" that *Thurston* concluded must exist. (*Id.* at p. 1240.) Nor, as the *Thurston* court alternatively put it, are The Basketry's sales totals "the equivalent of having a brick-and-mortar store in California." (*Ibid.*)

The trial court noted that *Thurston* cited to *As You Sow v. Crawford Laboratories, Inc.* (1996) 50 Cal.App.4th 1859 (*As You Sow*) for the proposition that there is no need for evidence that the Web site "targets" California residents in evaluating whether an interactive site presence on the internet gives rise to specific personal jurisdiction over a foreign defendant. The plaintiff in *As You Sow* sued a paint manufacturer that directly

---

[11] The dissenting member of the *Thurston* panel was of the view the "relatedness" requirement was not met. (*Snowney, supra,* 35 Cal.4th at pp. 1242–1245 (dis. opn. of Menetrez, J.).)

15

contacted distributors in California and sold and shipped its product to distributors in California for use in California, allegedly without complying with the label warning requirements of Proposition 65. (*Id.* at pp. 1863–1864.) During the five years preceding the lawsuit, the manufacturer had shipped its products to a government distribution facility and to 16 private distributors. (*Id.* at pp. 1864–1965.) The appellate court discounted the sales to the government because the manufacturer had no control where the products were eventually used. (*Id.* at p. 1868.) It concluded the sales to the private distributors, which were .3 percent of the manufacturer's worldwide sales (which, in the preceding five years, ranged from $3.2 to $6.0 million) (*id.* at p. 1864 & fn. 5) were sufficient to establish specific jurisdiction. And it was in this context, said the court, that courts "must focus on the nature and quality of the activity in the forum state, not the quantity. [Citation.] Otherwise, states would be unable to provide their injured citizens with redress against large companies because the sales in one state would represent a small fraction of the company's total revenue." (*Id.* at pp. 1869–1870.)

To begin with, *As You Sow* did not involve an internet site and it predates *Snowney* and most of the case law discussing purposeful availment by virtue of a presence on the world wide web. As we have discussed, the overwhelming majority of these cases, as did *Snowney*, have employed the "sliding scale" analysis and when a case falls in the mid-range of that scale, most courts have focused on the extent, as well as the nature, of the inter-activity. (*Snowney, supra*, 35 Cal.4th at pp. 1064-1065 [by "touting the proximity of their hotels to California and providing driving directions from California to their hotels" *and* because "many of their patrons come from California," defendants had a "substantial connection" with California]; see,

16

e.g., *Plixer International, Inc. v. Scrutinizer GMBH* (1st Cir. 2018) 905 F.3d 1, 10 [Web site operator's "voluntary service of the U.S. market *and* its not insubstantial income from that market show that it could have 'reasonably anticipated' being haled into U.S. court," (italics added)].)

Further, the principle recited in *As You Sow*—that sizeable manufacturers of products that intentionally ship their products into a state for use within that state should generally be answerable in that state for a defect or injury occurring within the state—is most often a feature of determining whether specific personal jurisdiction exists in personal injury and product defect cases. (See, e.g., *Ford Motor Co., supra,* 141 S.Ct. at p. 1027 [specific jurisdiction attaches "when a company like Ford serves a market for a product in the forum State and the product malfunctions there"]; *Seacrest Machine Corp. v. Superior Court* (1983) 33 Cal.3d 664, 670–673 [direct sale of product to a California business for use in California *plus* acts in connection with that sale, were sufficient to support specific personal jurisdiction in personal injury case]; *Bridgestone Corp. v. Superior Court* (2002) 99 Cal.App.4th 767, 774–779 [sale of tires to distributor for resale in California *plus* sales of at least 25,000 tires per month for delivery to California, approximately one-half of which were sold to consumers in California, was sufficient to support specific jurisdiction in personal injury case].) Furthermore, these cases have considered more than a sale to a single purchaser. (E.g., *Ford Motor Co.,* at p. 1028 ["By every means imaginable— among them, billboards, TV and radio spots, print ads, and direct mail—Ford urges Montanans and Minnesotans to buy its vehicles" and the models at issue "are available for sale, whether new or used, throughout the States, at 36 dealerships in Montana and 84 in Minnesota."]); cf. *Burger King, supra,* 471 U.S. at pp. 478–480 [existence of contract, alone, is not determinative;

17

other factors, such as prior negotiations, the terms of the contract and the parties' actual course of dealing all factor into whether a foreign defendant has " '[reached] out' " to the forum state and "purposefully established" minimum contacts].)

The instant case is not a personal injury or product defect case. Indeed, Ogletree's claim is not based on, nor does it depend on, the sale and delivery of *any* product to California for use in California. On the contrary, she could advance the ADA claim she makes here—that The Basketry's Web site is not accessible to visually impaired individuals—even if not a single California resident made an online purchase. And in this regard, we note that recent cases have overwhelmingly concluded that having an interactive Web site that allows purchases to be made anywhere on the planet with internet service is *not*, in and of itself, sufficient to support specific personal jurisdiction. (E.g., *Fidrych, supra,* 952 F.3d at pp. 141–142 & fn. 5 ["on today's internet, '[i]t is an extraordinarily rare website' that is *not* interactive at some level," and were the court to "attach too much significance on the mere fact of interactivity, we risk losing sight of the key issue in a specific jurisdiction case—whether 'the defendant has purposefully directed [his] activities at residents of the forum,' " italics omitted]; *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.* (7th Cir. 2014) 751 F.3d 796, 803 ["Having an 'interactive website' (which hardly rules out anything in 2014) should not open a defendant up to personal jurisdiction in every spot on the planet where that interactive website is accessible"]; *Britax, supra,* 321 F.Supp.3d at p. 556 [" '[t]he mere operation of a commercially interactive website should not subject the operator to jurisdiction anywhere in the world,' " quoting *Gammino v. SBC Communications, Inc. (*E.D. PA, Mar. 29, 2005, No. 03-CV-6686) 2005 WL 724130 at \*3]; see *Shisler v. Sanfer*

18

*Sports Cars, Inc.* (2006) 146 Cal.App.4th 1254, 1261 [defendant's Web site, which only advertised automobiles for sale and included credit application, could not, alone, establish personal jurisdiction over nonresident defendant where site did not specifically target California residents].)

In the most recent internet personal jurisdiction case decided by the California courts, the court in *Jacqueline B. v. Rawls Law Group, P.C.* (2021) 68 Cal.App.5th 243 (*Rawls Law Group*), held a Virginia law firm that the plaintiff located through the internet was not subject to specific personal jurisdiction in a malpractice case. The "firm's website stated that the firm ha[d] a 'nationwide' practice that handled Federal Tort Claims Act cases all over the country, and listed several examples of cases that had resolved favorably to the firm's clients. Two of the examples involved settlements in cases arising out of claims against California-based VA facilities. The website listed the firm's toll-free number . . . and had a 'Reach Out' form that could be filled out and submitted to the firm from the website." (*Id.* at pp. 248–249.) The site also had a " 'live chat' " function that the plaintiff used. (*Id.* at p. 249.) The firm mailed a retainer agreement to the plaintiff in California and subsequently negotiated a settlement proposal with VA attorneys located in Arizona. (*Id.* at pp. 249–250.) In the meantime, the plaintiff left California and eventually moved to Virginia, where she agreed to the settlement. (*Id.* at p. 250.) Two years later, she sued the firm for malpractice, claiming it had mis-analyzed California tort law and recommended too small a settlement. (*Ibid.*) The trial court granted the law firm's motion to quash; the Court of Appeal affirmed. (*Id.* at pp. 251, 259.)

The court concluded the defendant "did not purposefully direct any activities toward California residents. At most, the law firm operated a website that could be accessed by California residents, but the website did

not target California residents specifically and it was plaintiff who first contacted defendants." (*Rawls Law Group, supra,* 68 Cal.App.5th at p. 254.) "Although the website boasted that the firm had a 'nationwide' practice and set forth examples of prior settlements from persons who had received substandard treatment in California VA facilities, the website included examples from all around the country and the website itself was accessible from anywhere." (*Id.* at p. 255.) Given the interactive features of the site, it "occupied a 'middle ground' " on the sliding scale, "although the fact that plaintiff *herself* had to reach out to the firm directly confirm[ed] the minimal interactivity of the website." (*Ibid.*) Defendants did not "purposefully derive any benefit from the forum state over and above the potential contingency fee promised in the retainer agreement," and a discrete, short-term contract between an out-of-state defendant and a forum resident does not, in and of itself, establish purposeful availment.[12] (*Rawls Law Group,* at p. 255.)

Much the same can be said about The Basketry's Web site—"[a]t most, the [boutique] operated a website that could be accessed by California residents, but the website did not target California residents specifically and

---

[12] In contrast, in *Yue v. Yang* (2021) 62 Cal.App.5th 539, the court concluded that a defendant who posted allegedly unfair and defamatory content on the plaintiff's and a co-defendant's Web sites was subject to specific personal jurisdiction because he "targeted his postings at [the California] plaintiff, emphasized the California connection, and threatened to come to California, with an awareness that Californians would be in the audience." (*Id.* at p. 549.) Similarly, in *Zehia v. Superior Court* (2020) 45 Cal.App.5th 543, 558, the court concluded the defendant " 'purposefully "reach[ed] out beyond" [his s]tate and into' " California by sending "California-focused messages and conversations directly to California residents for the alleged purpose of interfering with the relationship of California residents and causing reputational injury in California."

20

it was plaintiff who first contacted defendant[]." (*Rawls Law Group, supra,* 68 Cal.App.5th at p. 254.)

In sum, we have grave doubt that the purposeful availment requirement is satisfied in this case. We need not definitively resolve the issue, however, since we are convinced the assertion of personal jurisdiction in this particular case would not comport with fair play and substantial justice.

*Fair Play and Substantial Justice*

"The strictures of the Due Process Clause forbid a state court to exercise personal jurisdiction over" a non-resident defendant "under circumstances that would offend ' "traditional notions of fair play and substantial justice." ' " (*Asahi Metal Industry Co. v. Superior Court* (1987) 480 U.S. 102, 113 (*Asahi*).) "[T]he determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors. A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It must also weigh in its determination 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.' " (*Ibid.*)

There are no "talismanic jurisdictional formulas; 'the facts of each case must [always] be weighed' in determining whether personal jurisdiction would comport with 'fair play and substantial justice.' " (*Burger King, supra,* 471 U.S. at pp. 485–486.) "[A]ny inquiry into 'fair play and substantial justice' necessarily requires determinations 'in which few answers will be written "in black and white. The greys are dominant and even among them the shades are innumerable." ' " (*Id.* at p. 486, fn. 29.)

21

In our view, what the courts, including the Supreme Court, are struggling with in cases like this one—involving a tiny boutique business with a Web site that does not focus on, target, or reach out to any particular jurisdiction and is discoverable only through the exploratory efforts of the party who has chosen to travel the internet highway—is the issue of fairness in a world where technology has upended traditional paradigms of commerce.

It is certainly true that more than 40 years ago in *World-Wide Volkswagen, supra,* 444 U.S. at pages 292–293 the Supreme Court observed that "[t]he limits imposed on state jurisdiction by the Due Process Clause" "have been substantially relaxed over the years"—a "trend . . . largely attributable to a fundamental transformation in the American economy," namely the " 'increasing nationalization of commerce' " and co-commitment lessening of a defendant's burden to respond where it engages in economic activity. However, the high court has never departed from the view that the defendant must "have followed a course of conduct *directed at* the society or economy existing within" the forum jurisdiction. (*J. McIntyre Machinery, Ltd. v. Nicastro Ltd.* (2011) 564 U.S. 873, 884, italics added.)

And in its most recent decision, the Supreme Court expressly suggested specific personal jurisdiction in cases like the one at hand may raise unique due process concerns, by contrasting the extensive sales and support activities of the Ford Motor Company with the efforts of a hypothetical entrepreneur selling his handcrafted decoys on eBay. The court commented:

> "[W]e do not here consider internet transactions, which may raise doctrinal questions of their own. See *Walden v. Fiore,* 571 U.S. 277 . . . (2014) ('[T]his case does not present the very different questions whether and how a defendant's virtual "presence" and conduct translate into "contacts" with a particular State'). So consider, for

example, a hypothetical offered at oral argument. '[A] retired guy in a small town' in Maine 'carves decoys' and uses 'a site on the Internet' to sell them. Tr. Of Oral Arg. 39. 'Can he be sued in any state if some harm arises from the decoy?' *Ibid.* The differences between that case and the ones before us virtually list themselves. (Just consider all our descriptions of Ford's activities outside its home bases.) So we agree with the plaintiffs' counsel that resolving these cases does not also resolve the hypothetical.[13] See *id.,* at 39–40." (*Ford Motor Co., supra,* 141 S.Ct. at p. 1028, fn. 4.)

In their concurring opinion, Justices Gorsuch and Thomas expressed concern that the majority had adopted a more flexible, but not well-defined, approach to the relatedness requirement. (*Ford Motor Co., supra,* 141 S.Ct. at p. 1034 (conc. opn. of Gorsuch J.).) What is of interest here, however, is

---

[13] The high court was no doubt aware that a number of federal and state courts have considered specific personal jurisdiction predicated on sales through eBay or similar internet platforms. The results reflect a spectrum— a single sale through such a platform without more is virtually always insufficient to establish purposeful availment, whereas regular and significant sales in the forum state through such a platform by a "power seller" may well suffice. (See, e.g., *Boschetto v. Hansing* (9th Cir. 2008) 539 F.3d 1011, 1018–1019 [one-time sale not sufficient]; *Adobe Systems Inc. v. Cardinal Camera & Video Center, Inc.* (N.D.Ca. Oct. 7, 2015, No. 15-cv-02991) 2015 WL 5834135 *5 [that 1.2 percent of sales through Amazon.com happened to go to California purchasers did not establish that defendant "expressly aimed" its actions at the forum state]; *Dedvukaj v. Maloney* (E.D.Mi. 2006) 447 F. Supp. 2d 813, 822 [use of eBay as commercial seller's primary market vehicle, sufficient]; *Guffey v. Ostonakulov* (2014) 321 P.3d 971, 974, 977–979 [totality of circumstances, including defendants' personal contacts with buyer outside the eBay platform, defendants' arrangement for delivery of automobile, and that defendants were " 'power seller[s]' " and used eBay as a central and regular aspect of their business, was sufficient], abrogated on another ground as stated in *Montgomery v. Airbus Helicopters, Inc.* (2018) 414 P.3d 824, 834, fn. 31.)

the concurrence's commentary on the footnote quoted above. "The majority says this hypothetical supplies a useful study in contrast with our cases. On the majority's telling, Ford's 'continuous' contacts with Montana and Minnesota are enough to establish an 'affiliation' with those States; by comparison, the decoy seller's contacts may be too 'isolated' and 'sporadic' to entitle an injured buyer to sue in his home state. But if this comparison highlights anything, it is only the litigation sure to follow. For between the poles of 'continuous' and 'isolated' contacts lie a virtually infinite number of 'affiliations' waiting to be explored." (*Id.* at p. 1035 (conc. opn. of Gorsuch, J.).) The concurrence then posited that the traditional *International Shoe v. Washington* (1945) 326 U.S. 310 model might not "work quite as well as it once did" because it could be said a retiree carving decoys "avails" himself "of the chance to do business across the continent after drawing online orders to his e-Bay 'store.'" (*Ford Motor Co.,* at p. 1038 (conc. opn. of Gorsuch, J.).) Thus, "[a] test once aimed at keeping corporations honest about their out-of-state operations," warned the concurrence, "now seemingly risks hauling individuals to jurisdictions where they have never set foot." (*Ibid.*) "Perhaps," said the concurrence, "this is the real reason why the majority introduces us to the hypothetical decoy salesman"—because "the old test no longer seems as reliable a proxy for determining corporate presence as it once did." (*Ibid.*)

The Basketry, of course, is much more like the hypothetical decoy carver with an online presence through eBay, than it is the Ford Motor Company. And turning to the traditional "grey" zone of "fair play and substantial justice," the burden on such a tiny boutique of defending itself in a foreign jurisdiction is extreme compared to the burden on such a national corporation.

While California has a keen interest in ensuring that a significant internet retailer that focuses on and targets Californians, and thus is operating the equivalent of an in-state brick and mortar store, is in compliance with the ADA (and, in turn, the Unruh Act), the state does not have a like interest when it comes to the hundreds of thousands, if not millions, of tiny enterprises around the world that do the lion's share of their business within their home jurisdiction and have a presence on the world wide web that does not focus on or target any particular jurisdiction and makes it clear they are not a California business.  Finally, we do not see that the "shared interests of the several States in furthering fundamental substantive social policies" (*Asahi, supra,* 480 U.S. at p. 113) requires that California exert jurisdiction over a small enterprise like The Basketry, since it is fully amenable to suit under the ADA in its resident state.

## DISPOSITION

The unopposed petition for writ of mandate is granted.  Let a peremptory writ of mandate issue directing the superior court in *Anita Ogletree v. The Basketry, Inc.,* (Super. Ct. Alameda County, No. RG19042771), to vacate its order of May 6, 2021 (filed May 7, 2021) denying The Basketry's motion to quash service of process, and to enter a new and different order granting that motion and dismissing the action against The Basketry.  This decision shall be final as to this court 10 court days after its filing.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)  The previously issued stay shall dissolve upon finality of this opinion.  The parties shall bear their own costs in this proceeding.

25

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Margulies, J.

A162746, Basketry, Inc. v. Superior Court for the County of Alameda